UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**STACEY OKEY ET AL**

**VERSUS**

**UNITED STATES OF AMERICA**

**CASE NO.  2:20-CV-00119**

**JUDGE JAMES D. CAIN, JR.**

**MAGISTRATE JUDGE KAY**

## MEMORANDUM RULING

Beginning on February 22, 2022, the court held a three-day bench trial on plaintiffs' claims of personal injury against the United States of America under the Federal Tort Claims Act ("FTCA"). Having considered the evidence and applicable law, as well as the post-trial memoranda submitted by the parties, the court now issues its ruling.

### I.
### BACKGROUND

This litigation arises from a car accident that occurred on the afternoon of December 15, 2017. The accident was a collision between a postal vehicle driven by United States Postal Service employee Roy Blanchette and a car driven by plaintiff Stacey O'Key, with plaintiffs Don Lewis and Lawryn Sweet as passengers. The accident occurred when Blanchette was parked in his vehicle on the side of the road and then drove forward as plaintiffs were turning around him to reach O'Key's driveway.

All three plaintiffs claimed injuries as a result of the accident and filed administrative claims with the United States Postal Service. *See* doc. 1, atts. 2, 3, 4. The agency failed to make a final disposition of the claim within six months and plaintiffs

timely filed suit in this court against the United States under the FTCA, 28 U.S.C. § 2675(a), on January 24, 2020. Doc. 1. The matter proceeded to trial, where the government did not contest jurisdiction or that Blanchette was acting in the course and scope of his employment with USPS, but contested both liability and quantum. After considering the testimony of witnesses and exhibits entered into evidence, as well as the post-trial briefs filed by both parties, the court now makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that a conclusion of law constitutes a finding of fact, the Court also adopts it as such.

## II.
### FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. The Accident

#### 1. Evidence adduced at trial

On the day of the accident Roy Blanchette, a mail carrier with the United States Postal Service, was operating a USPS vehicle while completing his route in a residential neighborhood. Blanchette had stopped his vehicle on the righthand side of Fontenot Road, in a residential neighborhood in Lake Charles, Louisiana, with his hazard lights on. Tr., Day 1, pp. 31, 51, 125, 203. At that time a vehicle containing plaintiffs—namely, driver Stacey O'Key and passengers Don Lewis (her significant other) and Lawryn Sweet (her daughter)—turned onto Fontenot Road, a two-lane street, headed to O'Key's home. *See* doc. 53, att. 2 (accident scene photos). O'Key testified that she had stopped behind Blanchette and then, upon realizing that he was not driving forward any time soon, passed to his left and made a right turn in front of him in order to reach her driveway. Tr., Day 1,

p. 28. O'Key testified that she was about halfway around Blanchette, with her front wheels in her driveway, when Blanchette drove forward and she felt his truck hit her car. *Id.* at 28. Both Lewis and O'Key testified that they did not see Blanchette's truck or realize that it was about to hit them until it made impact. *Id.* at 28, 126–27. Meanwhile Sweet, who was in the back seat, testified that she saw Blanchette begin to drive forward as they passed him and attempted to warn her mother. *Id.* at 203. Photographs from the scene show that the entrance to O'Key's driveway, which was partially blocked by a pile of debris on the side closest to Blanchette's truck, was at least a few meters ahead of the front of Blanchette's vehicle at the time it was parked. *See* doc. 53, att. 2, pp. 4–10. The collision resulted in damage to O'Key's front right tire. *Id.*; Tr., Day 1, pp. 34–5.

Plaintiffs testified that, as they drove around Blanchette, they saw him with his head down and that he appeared to be sorting through his mail. Tr., Day 1, pp. 28, 141, 203. Blanchette stated that he customarily stopped his vehicle at a mailbox for delivery and then sorted the mail for the mailbox ahead, because it would be dangerous to sort the mail while his vehicle was in motion. Tr., Day 3, pp. 378–80, 386. He could not recall whether he had checked his mirrors or blind spots before pulling forward on the day of the collision but asserted that it usually did not be done if he was staying in the same lane and simply moving forward to another curbside mailbox. *Id.* at 381, 386–87. The USPS 30(b)(6) representative, however, agreed that a delivery driver must ensure his path is clear before driving forward and yield the right of way, checking mirrors and blind spots before merging back into traffic. Doc. 52, att. 39, pp. 19–20. USPS's driving manual likewise advises drivers to signal, check mirrors and blind spots, "[w]ait for passing traffic, and always wait

until the lane is clear" when pulling away from the curb on a delivery route. Doc. 52, att. 38, p. 78. As a result of its investigation, however, USPS determined that Blanchette was not at fault for the accident and did not require him to undergo any additional training or disciplinary action. Doc. 52, att. 39, pp. 84–86.

Deputy Brent Smith was the investigating officer for the Calcasieu Parish Sheriff's Office. Based on interviews with the parties, he determined that Blanchette was distracted at the time of the accident and that his careless operation was a contributing cause. Doc. 52, att. 40, pp. 17–18, 67–71. Meanwhile, he ascribed no fault to O'Key. *Id.* at 67–71. He testified that she was allowed to drive around Blanchette's vehicle as there was no marking on the roadway preventing passing. *Id.* at 20. He stated, however, that his determination as to fault was based primarily on his weighing of the parties' statements and that he ultimately decided not to issue a citation to Blanchette. *Id.* at 36–37.

### 2. Liability

The FTCA, 28 U.S.C. § 2675(a), is a limited waiver of the government's sovereign immunity for certain tort claims brought against employees of the United States under the doctrine of respondeat superior. It provides district courts with jurisdiction over claims based on the negligent or wrongful acts of government employees "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2675(b). Accordingly, the court applies the tort law of the state where the alleged injury occurred—in this case, Louisiana— to determine the government's liability. *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009).

Louisiana courts determine liability for negligence based on a duty-risk analysis. *Long v. State ex rel. Dept. of Transp. and Dev.,* 916 So.2d 87, 101 (La. 2005). Through this test the plaintiff must show all of the following:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (citing *Lemann v. Essen Lane Daiquiris,* 923 So.2d 627, 633 (La. 2006)). The percentage of fault of all persons causing or contributing to an injury must be determined by the factfinder. *Hankton v. State*, 315 So.3d 1278, 1282 (La. 2020). In making this determination courts look to the factors set forth in *Watson v. State Farm Fire & Casualty Insurance Company*, 469 So.2d 967 (La. 1985), including:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significant of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.* at 974.

The government attempts to assign fault to O'Key by reference to two Louisiana statutes. The first, Louisiana Revised Statute 32:76, provides in relevant part that "[n]o vehicle shall at any time be driven to the left side of the highway . . . when approaching

within one hundred feet of or traversing any intersection[.]" As plaintiff notes, however, the definition of "intersection" specifically excludes "[t]he junction of a . . . driveway with a street or highway" unless the junction is controlled by a traffic signal. La. Rev. Stat. § 32:1(33)(c). Accordingly, it does not apply to O'Key's approach to her own driveway and the government fails to show that any intersection qualifying under the statute was within 100 feet of the area where O'Key attempted to pass Blanchette.

The second, Louisiana Revised Statute 32:73, is titled "Passing a vehicle on the left" and provides:

> The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions, and special rules hereinafter stated:
> (1) Except when overtaking and passing on the right is permitted, the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance, and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.
> (2) Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal, and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

La. Rev. Stat. § 32:73. Louisiana Revised Statute 32:75 further provides:

> No vehicle shall be driven to the left side of the center of the highway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. . . .

La. Rev. Stat. § 32:75.

Plaintiffs argue that these statutes are inapplicable because it is undisputed that Blanchette's vehicle was parked rather than "proceeding in the same direction" at the time

plaintiffs began to move ahead of it. From the circumstances of this case, however—an occupied mail truck parked in front of mailboxes with its hazard lights on—plaintiffs should have assumed that the truck would be proceeding forward at some point in the near future and treated it with at least some of the caution due to a vehicle proceeding ahead in the same lane. At the same time, by virtue of his position on the two-lane road, Mr. Blanchette was not merely parked and proceeding forward but instead merging into traffic when he put his truck back into drive. Accordingly, the USPS standards described above were also applicable to his conduct.

Louisiana law is clear that the driver of an overtaking vehicle "must be alert to the actions of the motorists preceding him on the highway" and that passing drivers have "a duty to ascertain from all circumstances of traffic, the lay of the land, and conditions of the highway that passing can be completed with safety." *Gohres v. Dryer*, 29 So.3d 640, 645 (La. Ct. App. 1st Cir. 2009) (internal quotations omitted). Because he is engaged in a dangerous maneuver, the passing motorist must exercise "a high degree of care." *Thibodeaux v. Ace Am. Ins. Co.*, 127 So.3d 132, 138 (La. Ct. App. 3d Cir. 2013). However, courts generally decline to apply a presumption of negligence. *E.g.*, *Duncan v. Safeway Ins. Co. of La.*, 799 So.2d 1161, 1163 (La. Ct. App. 2d Cir. 2001). Additionally, all drivers "owe a general duty to observe what should be observed." *Harbin v. Ward*, 147 So.3d 213, 217 (La. Ct. App. 1st Cir. 2014) (citing *Mart v. Hill*, 505 So.2d 1120, 1123 (La. 1987)).

Here there is no evidence that O'Key violated the applicable standard of care. She stopped behind Blanchette's vehicle. Upon observing that he was parked there and did not appear to be preparing to move forward, she passed him on the left and began to turn right

into her own driveway. Contrary to the government's assertions, photographs from the accident scene indicate that she turned a safe distance ahead of where Blanchette's vehicle was stopped. There was no prohibition against her maneuver and she had no other means of accessing her driveway other than waiting an indeterminate amount of time for Blanchette to proceed. Meanwhile, Blanchette testified that he did not realize she was turning in front him until the impact, indicating that he was not looking forward or otherwise checking around him for hazards when he put his vehicle into drive. Accordingly, the court finds that the government, through Blanchette, is 100% at fault for the accident and all resulting injuries.

### B. Stacey O'Key

#### 1. Treatment history

O'Key was thirty-nine years old at the time of the accident and working as a card dealer at a local casino. Tr., Day 1, pp. 24–25; *see, e.g.*, doc. 52, att. 2, p. 6. She testified that she noticed neck, back, and shoulder pain immediately after the collision, and that she had not had any issues with these areas of her body beforehand. Tr., Day 1, p. 35. She attempted to treat the pain with Tylenol and Advil for a few days before seeking chiropractic care at Wellness Management Chiropractic and Medical Group on December 21, 2017. *Id.* At the chiropractor she reported constant neck and upper lumbar pain, rated at a 9/10, and frequent pain in her right wrist, rated at a 7/10. Doc. 52, att. 2, pp. 4, 7. She treated at this clinic for one visit, using electric stimulation, hot and cold packs, biofreeze, and chiropractic manipulation. *See* doc. 52, att. 2. She reported continuing pain, however, and sought care at Lake Charles Chiropractic and Functional Medicine beginning on

February 7, 2018. Doc. 52, att. 3. She treated at this clinic, using many of the same modalities in addition to hydrotherapy, massage, and mechanical traction, several times through February and March 2018. *Id.* She also underwent MRIs of her neck and lumbar spine on February 12, 2018. *Id.* at 10–13. The report from the lumbar spine indicated no abnormal findings. *Id.* at 10. The report from the cervical spine showed "disc bulge and a left paracentral disc herniation and osteophyte ridge formation, [along with] osteophyte narrowing of the left foramen" at C3-C4 and "midline and left central disc herniation and osteophyte ridge formation" at C6-C7. *Id.* at 12.

O'Key's symptoms did not resolve during the chiropractic care, and she made an appointment with orthopedic surgeon Paul Fenn. Doc. 52, att. 4. At her first appointment, on March 1, 2018, she described constant pain in her neck, radiating into her left shoulder and arm, and in her right wrist and lower back. *Id.* at 139, 149–53. She rated her neck pain as a 9/10 and her lower back pain at 5/10. *Id.* at 147. Dr. Fenn prescribed diclofenac (an NSAID), Flexeril (a muscle relaxant), and Medrol (a steroid) for pain control along with Ultram (a narcotic) for breakthrough pain only. *Id.* at 152. He also recommended that O'Key begin physical therapy based on the MRI findings, along with use of a cervical traction kit and a splint for her wrist. *Id.* at 153.

O'Key began physical therapy at Southwest Louisiana Sports and Rehabilitation Center on April 1, 2018. Doc. 52, att. 10, p. 57. She was treated twenty-four times at this clinic from April through June, with complaints of left upper extremity radiculopathy, pain, and impaired shoulder range of motion, as well as pain and a popping sensation in her right wrist that interfered with her work as a card dealer. *Id.* at 1–12, 57–61, 144.

At her last visit for her neck and back, on June 11, 2018, O'Key showed improvement from moderate/severe pain and moderate impairment to mild impairment and pain. *Id.* at 122–24. However, she still reported that the pain disrupted her sleep one to two times a night, that she noticed pain ten to twenty-five percent of the time, and that she had not achieved any progress from her moderate impairment in the following areas: ability to stand without symptoms, lifting medium weight objects, and walking medium distances. *Id.* At her last visit for her wrist, on the same date, O'Key reported that she was still having issues with pain and range of motion. *Id.* at 166. The clinic documented that she had not made a full recovery with her wrist, since the pain would always return, and that her progress with physical therapy might have reached its peak. *Id.* at 166–68.

O'Key returned to Dr. Fenn on April 20, 2018, while she was still receiving physical therapy. Doc. 52, att. 4, p. 127. She reported that her pain was interfering with her sleep and her work. *Id.* Dr. Fenn recommended that she continue with the prescribed medications and traction kit, and referred her to Dr. John Crosby for evaluation for a cervical epidural steroid injection ("CESI"). *Id.* at 130. She saw Dr. Fenn again on June 29, 2018, and he administered an injection for her shoulder and referred her to neurosurgeon Dr. William Brennan for evaluation. *Id.* at 104. O'Key saw neurosurgeon Dr. William Brennan for the first time on August 15, 2018. Doc. 52, att. 5. At this visit he diagnosed her with left C6-C7 disk herniation and resultant C7 radiculopathy induced by a motor vehicle accident. *Id.* at 11–12. He also summarized her treatment history to that point, stated that he believed she would not improve any further without surgical

intervention, and recorded that he had discussed an anterior cervical diskectomy and fusion with her. *Id.* at 12.

On May 22, 2018, O'Key began treating for pain management at Allied Health with Dr. John Crosby and Dr. Michael Lane. Doc. 52, att. 7. A CESI was discussed at her first appointment but for whatever reason she did not proceed. *See id.* at 4–7. She returned several times over the next three and a half years, where her neck pain was primarily addressed through medication (including Tylenol 3). *Id.* at 4–113. In December she also received a cervical dorsal medial branch block and radiofrequency thermocoagulation from Dr. Crosby. *Id.* at 30–36. She reported decreased pain after the procedures but complained that her symptoms were worsening again in January 2021. *Id.* at 40–43, 63. She reported some improvement after physical therapy, but also that the pain returned and worsened with her job, which required her to look down for extended periods of time. *Id.* at 63.

O'Key then underwent a CESI in May 2021 and another in September 2021. *Id.* at 89, 161. In July 2021 she underwent an EMG nerve conduction study, which found evidence of denervation in the upper extremities suggesting the presence of C6-C7 radiculopathy. *Id.* at 144–146. After the second CESI O'Key reported some relief but also that she was still experiencing pain radiating into her left arm. *Id.* at 92. She then underwent another cervical medial branch block in October 2021, and reported at her follow-up visit that she was able to work without pain. *Id.* at 100–03.

O'Key also tried physical therapy again for her lower back, right wrist, and left shoulder at Maxx Physical Therapy, undergoing nine sessions from December 2020 to January 2021 and an additional sixteen sessions from July to November 2021. Doc. 52, att.

8. After treating for some time at Allied Health, as described above, O'Key returned to Dr. Fenn in June 2021, reporting constant pain in her left shoulder and neck and occasional pain in her right wrist. Doc. 52, att. 4, p. 85. In August 2021 Dr. Fenn performed another shoulder injection to treat the pain in that area and discussed the possibility of a shoulder arthroscopy pending her response to therapy and injection. *Id.* at 67. She returned in October and December 2021, however, reporting that her symptoms were unchanged and complaining of lower back pain as well. *Id.* at 8, 49. Dr. Fenn recommended possible arthroscopy for her right wrist as well, pending her response to therapy. *Id.* at 10.

O'Key also returned to Dr. Brennan in February 2022. Doc. 52, att. 6. At this visit she stated that her neck/left upper extremity pain had returned, identical to its severity in 2018, though she had received temporary relief from the injections. *Id.* at 10. Dr. Brennan recommended surgery again and she indicated she would like to discuss it with her family and then proceed. *Id.*

### 2. O'Key testimony

O'Key testified that her injuries had limited her daily activities in several respects. She stated she was no longer able to take an active role with her son's sports, carry her grandchild, exercise, or to style hair from her home, as she had done before the accident.[1] Tr., Day 1, pp. 44–46. She also described how the repetitive motions of her job exacerbated her injuries. *Id.* She further testified that she intended to proceed with the surgery recommended by Dr. Brennan, but that she first had to accrue enough paid time off and

---

[1] Numerous friends corroborated her account, though as defense raised in cross-examination, many of these had also been plaintiffs in their own personal injury suits.

save up money for the time she would be off work following the procedure. *Id.* at 42–43. Finally, she stated that her symptoms began after the crash and that she had never had any issues with these areas of her body beforehand. *Id.* at 46–47. She testified, however, that she was not claiming lower back pain as one of her post-accident injuries. *Id.* at 59–60.

### 3.  Life care plan

A life care plan was prepared by Dr. Aaron Wolfson, in consultation with Dr. Brennan and Dr. Lane, and entered into evidence at trial. *See* doc. 52, att. 46. In this document Wolfson forecasted O'Key's need for future medical care, namely those associated with the pain management recommended by Dr. Lane and the surgeries recommended by Dr. Brennan. *Id.* He predicted total costs at a low end of $822,701.57 and a high end of $1,013,361.50. *Id.* Plaintiffs' economist, Dr. Shael Wolfson, estimated the present value of these costs to range from $881,713.00 to a midpoint of $985,985.00 and high point of $1,090,257.00. Doc. 52, att. 49.

### 4.  Opinion testimony

At trial the court heard from biomechanics engineer Dr. Amy Courtney as well as O'Key's treating physicians Drs. John Crosby, Michael Lane, William Brennan, and Paul Fenn, and defense IME physicians Drs. Robby Leblanc and Neil Romero.

#### a.  Amy Courtney

Dr. Courtney was accepted by the court as an expert in the field of biomechanical engineering. Tr., Day 3, p. 416. She opined, based on her review of accident data and subsequent modeling, that there was no biomechanical mechanism to account for the injuries identified by plaintiffs' treating providers. *Id.* at 419–22. Specifically, she testified

that the subject collision was a minor event with a total Delta V of less than 1.5 miles per hour. *Id.* at 425–28. She then went through a detailed analysis of all the plaintiffs' injuries and opined that this change in force could not have accounted for any of the results they had claimed. *Id.* at 428–59.

Dr. Courtney admitted that the modeling for this accident was more unusual because of the point of impact at O'Key's front tire, but maintained that she was still able to obtain sufficient stiffness values to analyze the severity of the collision. *Id.* at 421–22. She also admitted that she had no information on the exact position of the vehicles during the accident and that none of the studies on which she relied regarding resulting injuries involved aggravation of preexisting conditions. *Id.* at 459–64. Finally, she acknowledged that disc material degenerated with aging and that a single excessive strain or injury, including from a sneeze, could lead to a herniation. *Id.* at 467–69. She maintained, however, that such a herniation would usually result in immediate and severe pain and that the degeneration for individuals in O'Key and Lewis's age group would not be very significant. *Id.*

**b. John Crosby**

Dr. John Crosby, a physician board certified in anesthesiology and pain management, was accepted by the court as an expert in those fields. Tr., Day 1, p. 62. He described his treatment of O'Key at Allied Health, as summarized in the records above, up until the time he left that clinic in September 2020. *Id.* at 62–85. He opined that O'Key's symptoms were caused by injuries she suffered in the collision and that the treatment he provided was necessitated by those injuries. *Id.* at 86–87. He also opined that she would

need future medical treatment for her neck, even if she underwent the surgery recommended by Dr. Brennan at C6-C7, in order to address the other issues at C3-C4 and because the surgical correction at one level would typically cause the levels above it to "become more active" and "break down quicker than they would have otherwise." *Id.* at 87–89. He admitted, however, that he had not seen O'Key in person since December 2019 and that some of his opinions arose from her subjective pain complaints. *Id.* at 103–04. He also admitted that O'Key was only referred for her C6-C7 diagnosis and radiating pain, but that he had found based on her abnormal imaging and self-report that she was also experiencing symptoms from the C3-C4 injury. *Id.* at 108–12.

### c.  Michael Lane

Dr. Michael Lane, a physician specializing in physical medicine and rehabilitation, musculoskeletal medicine, and pain management, was accepted by the court as an expert in the field of pain management. Tr., Day 1, p. 154. He described his treatment of O'Key, as summarized in the records above, beginning with their first encounter on May 7, 2021. *Id.* at 154–57. He also testified that his exam and the EMG performed in July 2021 confirmed that her symptoms of radiating pain were caused by the herniation at C6-C7, and that her reaction to the injections performed in October 2021 also indicated that the herniation at C3-C4 had been causing additional symptoms. *Id.* at 157–65. He also agreed that O'Key would continue to require future medical care, including physical therapy and repeat RFAs, for her neck even if she had the surgery. *Id.* at 165–72. He admitted that he was no longer treating O'Key, however, having left Allied Health to form his own clinic, and had not seen her since the end of 2021. *Id.* at 181–83.

### d. William Brennan

Dr. Brennan, a board-certified neurosurgeon, was accepted by the court as an expert in that field and testified to his treatment of O'Key as described above. *Id.* at 240–41. He emphasized that his recommendation for surgery at C6-C7 did not mean there was no pathology at the upper level, but instead that the injury there was not surgical at this time. *Id.* at 245–47. Finally, he testified based on his experience that a person could sustain neck or back injuries even in a low-speed vehicle crash, that O'Key's complaints were consistent with the results of her exam and MRI, and that he believed the collision in December 2017 caused her disc injury. *Id.* at 249–50.

On cross-examination Dr. Brennan admitted that it was rare for patients experiencing the pain described to wait as long as O'Key had before finally deciding to pursue a surgical fix. *Id.* at 250–54. In O'Key's case, however, he explained that her other injuries and her pursuit of medical options to treat them would contribute to the delay as opposed to a patient who was only dealing with the surgical injury. *Id.* at 254–55. He also testified that O'Key had not had any updated imaging of her cervical spine done since 2018, but that she was tentatively scheduled for surgery on May 4, 2022, and would have updated studies in advance of the procedure. *Id.* at 256–59. Finally, he emphasized that the EMG performed in 2021 confirmed that her injury at C6-C7 was worsening and that he did not expect the results of an updated MRI to change his recommendation. *Id.* at 259–61. Finally, he reviewed the life care plan and agreed with the recommendation for 18 sessions of physical therapy after each of her anticipated two surgeries and possibly more over the course of her lifetime. *Id.*

### e.  Paul Fenn

Paul Fenn, a board-certified orthopedic surgeon, was accepted by the court as an expert in that field and testified about his treatment of O'Key as summarized in the records above. Tr., Day 2, pp. 298–300. He testified that his treatment had primarily focused on O'Key's shoulder and wrist, and that the conservative therapies he provided—namely, injections and physical therapy—yielded improvement but no resolution of her symptoms. *Id.* at 307–10. He recommended arthroscopy for the right wrist in the event the symptoms there became unbearable, and further related her lower back pain to the accident. *Id.* at 311–15.

### f.  Robby LeBlanc

Dr. Robby LeBlanc, a board-certified orthopedic hand surgeon, was accepted by the court as an expert in that field. Tr., Day 3, pp. 490–92. He testified as to the IME he performed on O'Key in June 2021. Based on that examination, he did not believe that she required a wrist arthroscopy and testified that his exam of her allegedly injured right wrist yielded nearly identical findings as to her uninjured left wrist. *Id.* at 492–98. He further testified that O'Key did not appear to be experiencing any wrist pain when he examined her and that she was more concerned by an occasional popping sound from her wrist. *Id.* at 498–99. However, the MRI showed no sign of injury and instead only showed incidental subchondral cysts. *Id.* at 499–500. Accordingly, he did not link any symptoms of pain in her wrist or need for future treatment to the December 2017 accident. *Id.* at 500–02.

### g.  Neil Romero

Dr. Neil Romero, a board-certified orthopedic spine surgeon, was accepted by the court as an expert in that field and testified as to the IME he performed on O'Key in July 2021. Tr., Day 3, pp. 537–40. He agreed that O'Key's symptoms were consistent with the disc osteophyte at C6-C7 but recommended further conservative treatment instead of surgery. *Id.* at 542. Specifically, he believed that O'Key's response to the CESIs was promising and that she should pursue further injections. *Id.* at 555–57.

Dr. Romero disputed that the pathology at that disk was caused by the accident, noting that it was present on an MRI performed just months after the collision but that "[w]e know that disc osteophyte complexes take a while to form." *Id.* He further testified that such complexes were more typically associated with a degenerative condition, but admitted that there was no objective testing that could confirm the existence of a degenerative condition beyond suppositions based on her imaging. *Id.* at 547–52. He also conceded that he had known patients with undiagnosed degenerative conditions to become symptomatic after a crash. *Id.* at 560–61. Finally he admitted that, in the event O'Key failed further nonoperative treatment, he would agree that the surgery recommended by Dr. Brennan would be the appropriate treatment. *Id.* at 553–54. He disputed the life care plan's conclusions, however, that she would require ongoing pain management care and noted that the fusion surgery was 95% effective at relieving symptoms. *Id.* at 554–55.

## C. Don Lewis

### 1. Treatment history

Lewis was 33 years old at the time of the accident and working as a pipefitter helper at CB&I. Tr., Day 1, pp. 123, 137–38; doc. 52, att. 34, p. 6. After the accident he first sought care at Wellness Management Chiropractic and Medical Group on December 21, 2017. Doc. 52, att. 34. There he reported that he had been in the front passenger seat when the car was struck on the right side, and complained of frequent pain in his mid- and lower-back and right shoulder since the accident, all of which he rated at an 8/10. *Id.* at 4–6. Lewis was treated at Wellness on December 21 and 27, 2017, with ultrasound, hot/cold packs, electrical stimulation, biofreeze, massage, and chiropractic manipulation. *Id.* at 3–8.

Lewis next sought care at Lake Charles Chiropractic and Functional Medicine beginning on February 8, 2018. Doc. 52, att. 28. Here he reported low back, neck, and right shoulder pain following the crash. *Id.* at 61. He also reported that he was experiencing pain with his daily activities, making his job more difficult. *Id.* The doctor from this clinic ordered MRIs of the lumbar and cervical spine, which were taken in February 2018. *See* doc. 53, att. 24. Lewis underwent chiropractic treatment at this clinic several times over the next two months, but reported at his final visit on April 5, 2018, that he was continuing to experience pain. *Id.* at 2–8, 147.

Lewis also began treating with orthopedist Dr. Paul Fenn on March 1, 2018. Doc. 52, att. 29. At his first visit he complained of neck pain radiating into his right shoulder and lower back pain radiating into his lower extremities. *Id.* at 65. He also reported that he had been on light duty at work since the accident. *Id.* Dr. Fenn reviewed the cervical and

lumbar spine MRIs performed in February 2018, which showed disc bulging and neural canal narrowing at various levels in the cervical spine along with right paracentral herniation with mild cord impingement at C2-C3 and bulging at various levels with herniation at L4-L5 in the lumbar spine. *Id.* at 85–88; *see* doc. 53, att. 24. Dr. Fenn prescribed medication, a cervical pillow, and traction kit, and recommended continued conservative treatment along with a right shoulder MRI. *Id.* at 69, 88.

Lewis returned to Dr. Fenn on May 10, 2018. *Id.* at 51. At that visit Dr. Fenn noted that the right shoulder MRI, which had been taken earlier in the month, showed a SLAP (Superior Labrum, Anterior to Posterior) tear in his right shoulder and that Lewis continued to experience limitations at work along with pain in his neck and back and shoulder pain with movement. *Id.*; *see* doc. 53, att. 32 (MRI report). Dr. Fenn recommended that Lewis either continue with conservative treatment or consider surgery for his shoulder. Tr., Day 1, p. 51. Lewis opted for conservative treatment, through a prescription of Mobic, and received an injection in his shoulder for pain on May 17, 2019. *Id.* at 24. At a follow-up in July, he reported that his symptoms had improved. *Id.* at 16. He refilled his medication with Dr. Fenn in October 2019. *Id.* at 14. At this visit he also reported that his shoulder symptoms were improving along with his range of motion. *Id.* at 12.

Lewis also began seeing Dr. Crosby at Allied Health for pain management beginning on April 24, 2018. Doc. 52, att. 30. At the first visit he reported low back pain radiating into his lower extremities and neck pain radiating into his right shoulder. *Id.* at 5. Based on his exam and review of records, including the spinal MRIs, Dr. Crosby diagnosed Lewis with cervicalgia, right shoulder pain, low back pain, and lumbar radiculopathy

arising from the December 2017 car accident. *Id.* at 5–8. Dr. Crosby administered a Lumbar Transforaminal Epidural Steroid Injection ("LESI") at that visit to treat Lewis's low back pain. *Id.* at 8–9. At a follow-up visit on May 22, 2018, Lewis reported "excellent benefit with complete resolution" of the lumbar radiculopathy, though the low back pain itself persisted and worsened with bending, twisting, and prolonged sitting. *Id.* at 8–9. Dr. Crosby also recorded that Lewis took very little medication and continued to work. *Id.* at 13.

Lewis next saw Dr. Crosby on November 20, 2018. *Id.* at 14. At this visit he complained again of low back pain. *Id.* He was not seen again, however, until January 28, 2020, when he underwent a Diagnostic Medial Branch Block ("DMBB") procedure. *Id.* at 21. Lewis reported improvement to his lower back symptoms at his follow-up in February and then underwent a Radiofrequency Ablation ("RFA") in July 2020. *Id.* at 24, 31. Lewis also reported improvement after the RFA. *Id.* at 35. At a follow-up in January 2021 Lewis reported that he was still receiving pain relief from the RFA, rating that relief at a 96 percent reduction. *Id.* at 44.

After Dr. Crosby left Allied Health, Dr. Michael Lane took over Lewis's care at that clinic. He first saw Lewis at a follow-up visit on May 6, 2021. *Id.* at 46. There Lewis reported that his low back pain had started returning approximately one month ago, but without radiculopathy and that it remained manageable at home with over-the-counter medication. *Id.* at 46, 49. He also reported that his shoulder pain was returning, though he had not followed up with Dr. Fenn in some time. *Id.* at 46. Dr. Lane recommended that Lewis return to Dr. Fenn for his shoulder and follow up at Allied in four to six weeks to see whether a repeat DMBB was indicated for his back. *Id.* at 49.

At a follow-up visit with Dr. Lane on June 24, 2021, Lewis reported that his low back pain had returned to his pre-RFA baseline. *Id.* at 51. Dr. Lane recommended a second DMBB, with another RFA to follow if the DMBB provided good pain relief. *Id.* at 54. A lumbar RFA was performed on September 10, 2021. *Id.* at 58. At a follow-up visit on January 6, 2022, Lewis reported that his pain levels had decreased since the procedure and that he had gradually been able to increase his exercise regimen. *Id.* at 72. Lewis also testified that he saw Dr. Fenn for a final time two weeks before trial and indicated that he was ready to proceed with surgery for his shoulder, though he had not yet scheduled the procedure. Tr., Day 1, pp. 150–51.

### 2.  Lewis testimony

At trial Lewis testified that his right shoulder and lower leg hit the door of the car at the time of the crash. Tr., Day 1, p. 127. He reported that he still experienced some shoulder pain since the accident, and planned to address the latter with another injection and then surgery with Dr. Fenn in the summer of 2022. *Id.* at 132–33. He also reported that he would get about two to three months relief from the RFAs performed at Allied, but that the pain would return. *Id.* at 133–34. He denied experiencing any problems or needing any treatment for his neck, back, or shoulders prior to the December 2017 accident. *Id.* at 135–38. He testified that his injuries had limited his ability to play sports with his sons and restricted him to light duty at his pipefitter assistant job and at a subsequent job building scaffolding. *Id.* at 135–38. Lewis's family members testified that they had observed him in pain, particularly from his back, since the accident and that he was less active and less able to participate in physical tasks. *Id.* at 194–95, 222–23, 228, 234.

Lewis admitted, however, that his current scaffolding job was a strenuous one and that he had not identified any physical limitations when he completed regular fitness evaluations for his work. *Id.* at 143–45; *see* doc. 53, atts. 27 & 31. Additionally, the defense showed on cross-examination that Lewis had been in a motor vehicle accident in October 2018 and complained of right shoulder pain when he visited the emergency room soon after. Tr., Day 1, pp. 147–48; doc. 53, att. 19. Finally, Lewis admitted that he had never pursued physical therapy for his injuries and that he had not seen Dr. Fenn for his shoulder in between his last visit, two weeks before trial, and the prior one in October 2019. *Id.* at 148–51.

### 3.  Life care plan

Dr. Aaron Wolfson prepared a life care plan for Lewis, in consultation with Dr. Fenn and Dr. Lane. He forecasted Lewis's future surgical needs to include two further DMBBs over his lifespan, one lumbar RFA every ten years, and one shoulder arthroscopy. Doc. 52, att. 48, p. 7. He also forecasted future maintenance physical therapy at twelve sessions per year and 48 to 72 sessions of post-operative physical therapy after Dr. Fenn's procedure, in addition to medications, wellness membership, and laboratory and diagnostics. *Id.* at 1–8. Dr. Wolfson predicted costs between a low end of $350,541.36 and $561,124.36, and plaintiff's economist estimated the present value of these costs to range from a low end of $360,328.00 to a midpoint of $475,180.00, to a high point of $590,032.00. *Id.* at 8; doc. 52, att. 51. Excluding the costs associated with the shoulder arthroscopy, however, the present value of future costs reach a midpoint of only $415,294.00.

### 4. Opinion Testimony

At trial the court heard opinion testimony from defense biomechanics expert Dr. Amy Courtney, as summarized above. Plaintiffs also introduced testimony from Lewis's treating physicians, Drs. Crosby, Lane, and Fenn, and the defense introduced testimony from IME physicians Drs. Neil Romero and Justin Penton.

### a. John Crosby

Dr. Crosby was accepted by the court as an expert in the fields of general surgery and pain management. Tr., Day 1, p. 62. He testified about his treatment of Lewis, as summarized above. He stated that Lewis's complaints were consistent with what Dr. Crosby observed from the imaging and the exam, and that Lewis received the expected amount of pain relief from the DMBB and RFAs. *Id.* at 92–96. Finally, he testified that it was more probable than not that Lewis's lumbar spine injury was caused by the December 2017 crash and that the treatment he had received at Allied was reasonable and medically necessary. *Id.* at 96–98.

### b. Michael Lane

Dr. Lane was accepted by the court as an expert in the field of pain management. Tr., Day 1, p. 157. He summarized his treatment of Lewis, as described above, including the RFA performed in September 2021. *Id.* at 173–76. He also testified about his participation in the life care plan and stated that he had recommended the repeat procedures outlined therein. *Id.* at 178–80. Finally, he testified that he viewed Lewis's lumbar spine injury as a result of the 2017 crash and that the treatment he had received at Allied was reasonable and medically necessary. *Id.* at 180–81.

### c.  Paul Fenn

Dr. Fenn, an orthopedic surgeon, was accepted by the court as an expert in that field. Tr., Day 2, pp. 298–300. He summarized his treatment of Lewis, as described above. He also testified that a SLAP tear was commonly a surgical injury and could be sustained in a low-speed car accident, particularly if the patient's shoulder slammed against the car on impact. *Id.* at 318–19. He further testified that Lewis's imaging and symptoms were both consistent with such a tear, and that he believed surgery was indicated based on his exhaustion of more conservative treatments. *Id.* at 325–26. Dr. Fenn mistakenly testified that Lewis had tried physical therapy for the injury but maintained that surgery was the only way to repair the damage caused by the tear. *Id.* at 325–28. Additionally, Dr. Fenn admitted that he had not seen Lewis between October 2019 and February 15, 2022, with the last visit falling less than two weeks before trial and nearly two and a half years after the previous one, and that Lewis currently did not have the shoulder surgery scheduled. *Id.* at 363–64.

### d.  Neil Romero

Dr. Neil Romero, an orthopedic spine surgeon, was accepted as an expert in that field and testified that he performed an IME on Lewis. Tr., Day 3, pp. 538–40. However, his testimony at trial was confined to his opinions regarding O'Key. In his report Dr. Romero acknowledged that Lewis appeared to have suffered a cervical strain, now resolved, as a result of the collision and that his lumbar symptoms also appeared related to the accident. Doc. 53, att. 62.

### e.  Justin Penton

Dr. Justin Penton, an orthopedic surgeon, was accepted by the court as an expert in that field. Tr., Day 3, pp. 578–81. He testified that he performed an IME on Lewis in June 2021 and as a result of that examination, concluded that the tear Lewis had sustained was not caused by the December 2017 car accident. *Id.* at 581–82. Specifically, he pointed out that Lewis had described the impact as a side-to-side motion while labral injuries were usually sustained through either a traction injury, where the arm was yanked out of the socket, or an acute subluxation or dislocation, "where the glenohumeral joint, the actual humeral head or the ball, is translated in an anterior-to-posterior or front-to-back mechanism, not in a compression mechanism." Tr., Day 3, p. 584. A side-to-side impact, he noted, would instead produce a compression injury. *Id.* Additionally, Dr. Penton observed that Lewis's exam findings were "fairly normal" with no pain reproduced on anterior loading shift, a test designed to reproduce the subluxation event and put pressure on the labral tear. *Id.* at 585. Lewis did have a positive result on an O'Brien's test, but Dr. Penton testified that this result was more indicative of a bicep tear. *Id.* at 586.

Dr. Penton acknowledged that the MRI showed evidence of a labral tear, but testified based on his examination and the analysis conducted by another defense expert that the tear was more likely a chronic event rather than acute traumatic injury. *Id.* at 586–88. Specifically, he noted findings on the MRI such as the appearance of the tear, the presence of a paralabral cyst and other signs of chronic damage to the tissue, a lack of bone bruising, and a lack of fluid/acute hemorrhage. *Id.* at 588–90. He also described Lewis's long history as an "overhead athlete" (playing baseball), from the age of five or six until

age sixteen, as a common cause of chronic tears to the superior labrum. *Id.* at 590. He opined that this tear had not reached the level of requiring surgical intervention, because Lewis had not undergone any physical therapy, was only taking over-the-counter anti-inflammatories to manage the pain, had not sought treatment for the shoulder in over two years, and had continued working in manual labor jobs. *Id.* at 591. Finally, he asserted that the injection Lewis had received in 2019 for his shoulder was not even the type best suited to alleviate pain for a SLAP tear. *Id.*

### D. Lawryn Sweet

#### 1. Treatment history

Lawryn Sweet was seventeen years old at the time of the accident and was a rear passenger, seated behind Lewis and not wearing a seat belt. *See, e.g.*, doc. 52, att. 25, p. 14; doc. 52, att. 18, p. 88. Records from her pediatrician show that she had reported knee pain at an office visit in 2012, worsening with activity and persisting for the last several years. Doc. 53, att. 45, p. 9. She was treated for this condition in 2012 by an orthopedic surgeon, who diagnosed her with chondromalacia of the patella and referred her to physical therapy. Doc. 53, att. 50. After the accident she first sought care at Wellness Chiropractic on December 21, 2017, where she reported lumbar pain at a severity of 7/10 and pain in her right knee and wrist at the same severity. Doc. 52, att. 25, p. 14. She was treated with traction, massage, trigger point therapy, electrical stimulation, ultrasound, moist heat, and biofreeze. *Id.* at 3–4.

Sweet reported that her symptoms had not resolved and next sought treatment at Lake Charles Chiropractic and Functional Medicine on February 7, 2018. At this visit she

also reported right wrist, right knee, and back pain resulting from the December 2017 crash. Doc. 52, att. 17, p. 35. She returned to this clinic several times over the next month and was treated with a tens unit, biofreeze, hydrotherapy, cold/hot packs, therapeutic exercises, manipulation, muscle stimulation, traction, and a patella stabilizer. *Id.* at 35–87. Nonetheless, she reported after her last session on March 7, 2018, that she was still experiencing pain and difficulty performing daily activities such as writing for extended periods of time while doing homework. *Id.* at 87. A knee MRI was also ordered while Sweet was under the care of Lake Charles Chiropractic. The history segment of the report noted that Sweet had had knee pain for several years, worsening after the accident. Doc. 52, att. 24, p. 6. The MRI found a slightly discoid lateral meniscus, but with no tear, and a small effusion with minimal Baker's cyst. *Id.*

Sweet also sought care with orthopedist Dr. Paul Fenn for her knee and wrist pain on March 1, 2018. Doc. 52, att. 18, pp. 88–89. Dr. Fenn diagnosed Sweet with a nonossified fibroma of her posterior distal femur, which was not painful at this point, as well as discoid meniscus and contusion of her right knee and an unspecified sprain of her right wrist. *Id.* at 90–91. He prescribed medications and recommended an MRI and physical therapy for the wrist, which should have improved significantly by this point, as well as a repeat MRI in three months for the knee. *Id.*

Sweet followed up at Dr. Fenn's office on May 10, 2018, reporting continuing pain in her right knee and wrist as well as pain in her left knee from compensating on that leg. *Id.* at 73. Her wrist MRI showed a possible tear of the triangular fibrocartilage complex based on increased signal in that area, though the MRI report noted that the image was

suboptimal due to movement. *Id.*; doc. 52, att. 20, p. 7. Sweet reported that she was in physical therapy for her wrist and that this had helped some, but that she had not yet started physical therapy for her knee. Doc. 52, att. 18, p. 73. Dr. Fenn diagnosed her with iliotibial band fiction syndrome of the right knee and recommended considering needle arthroscopy if Sweet's symptoms did not improve after a course of physical therapy. *Id.* at 76. He also found that a TFCC tear diagnosis correlated well with her symptoms, recommended continuing with physical therapy as well as a splint, and raised the possibility of magnetic resonance arthrography ("MRA") for the wrist if Sweet's symptoms did not resolve. *Id.*

Sweet completed 17 sessions of physical therapy for her wrist at Southwest Rehabilitation Center between April 19 and July 12, 2018. Doc. 52, att. 21, pp. 46–81. At her final session she reported good range of motion but continued pain. *Id.* at 81. She began physical therapy for her knee on May 22, 2018, completing seven sessions between that date and July 12, 2018. *Id.* at 98–116. At her final visit she reported that she was still experiencing knee pain, but that it went away after taking Tylenol. *Id.* at 115. She also showed improvement in many of the range of motion goals set for her therapy, though her strength deficits remained unchanged with reports of mild to moderate deficits in several domains. *Id.* at 115–16.

Sweet saw Dr. Fenn again on June 29, 2018. Doc. 52, att. 18, pp. 61–64. At this visit he urged her to continue with physical therapy for her knee. *Id.* at 64. He also recommended an MRA of her wrist and possible referral to a hand surgeon pending review. *Id.* The MRA took place on September 25, 2018, and showed a "partial tear of the dorsal and membranous and the scapholunate ligament," though the "scapholunate interval is normal

and intact with no widening or diastases." *Id.* at 55–56. Sweet saw Dr. Fenn again on October 23, 2018, and complained of continued knee pain with weight bearing along with numbness in her right hand. *Id.* at 51. She stated that she was treating the pain with naproxen, an over-the-counter anti-inflammatory, PRN. *Id.* Dr. Fenn recommended resuming physical therapy for the knee. *Id.* at 53. He found that her wrist symptoms and MRA results were consistent with mild carpal tunnel syndrome. *Id.* at 54. Accordingly, he ordered a brace and referred her to a hand surgeon. *Id.*

Sweet next saw Dr. Fenn on December 6, 2018, reporting intermittent knee pain and wrist pain, both of which she was treating with ibuprofen PRN. *Id.* at 39. At this time she reported that she had resumed physical therapy for her knee and physical therapy and occupational therapy for her wrist, though plaintiffs have produced no records of these visits. *Id.*

Dr. Fenn saw Sweet again on February 14, 2019, at which time she reported she was nine weeks pregnant. *Id.* at 31. She stated that she had stopped taking all pain medication and that her knee pain was intermittent while her wrist pain worsened with activity. *Id.* Dr. Fenn recommended icing and bracing for the wrist, with surgical interventions placed on hold due to the pregnancy. *Id.* at 33. For the knee he recommended icing and activity modifications. *Id.* at 34. Sweet attended a follow-up appointment on May 31, 2019, at 25 weeks, and reported that her wrist pain had increased recently. *Id.* at 25. Dr. Fenn recommended continued bracing and range of motion exercises, with reassessment to follow after delivery. *Id.* at 27–28. She saw him again on January 24, 2020, following delivery, and reported continued wrist symptoms along with swelling in her knee. *Id.* at

17–20. Dr. Fenn recommended home exercise for the wrist and repeat X-rays, with an evaluation for wrist arthroscopy surgery pending results of the X-ray. *Id.*

No X-ray was performed, however, and Sweet did not return to the clinic until June 2, 2021, at which time she was five months pregnant. *Id.* at 8–11. At this appointment she reported that her pain had increased after the activity restrictions and cessation of her non-steroidal anti-inflammatory medications caused by the pregnancy. *Id.* Dr. Fenn noted that she remained a surgical candidate for her wrist and knee, but that these options could not be considered until after she had delivered and was no longer breastfeeding. *Id.* This was Sweet's last appointment with Dr. Fenn until just before trial, when she testified that she wished to proceed with operations on both her knee and wrist. Tr., Day 1, pp. 210–11.

### 2.  Sweet's testimony

Sweet testified that, at the time of the accident, she was holding onto the seat in front of her and was pushed forward by the impact. Tr., Day 1, p. 204. Afterwards, she felt a "weird feeling" in her wrist and a popping in her knee, which began to swell that night. *Id.* at 205. She recalled feeling little improvement from the chiropractic care or physical therapy. *Id.* at 206–10. Accordingly, she had visited Dr. Fenn two weeks ago and planned to proceed with the arthroscopic surgeries he had recommended at some point in April. *Id.* at 210–11.

Sweet also testified that she had experienced problems with the same knee prior to the accident, but stated that these issues were limited to when she was playing softball in her early teens. *Id.* at 212. She further stated that she only iced the knee when it hurt, and

had not needed to do so within a year before the accident. *Id.* at 212–13. After the accident, she stated, her injuries limited her ability to take care of her aging grandfather. *Id.* at 213.

### 3.  Life care plan

Dr. Aaron Wolfson prepared a life care plan for Sweet, in consultation with Dr. Fenn. He estimated future medical costs based on Dr. Fenn's recommendation of a right wrist arthroscopy with debridement, right wrist carpal tunnel release, and right knee arthroscopy with debridement, with many of the costs (such as physical therapy, post-operative visits, and medication) in triplicate based on the three procedures. Doc. 52, att. 47. From these he estimated low end future costs of $133,758.99 to high end of $153,189.99. *Id.* at 6. Plaintiffs' economist then translated these costs to a present value ranging from a low point of $133,759 to a midpoint of $143,474 and a high point of $153,190. Doc. 52, att. 50.

### 4.  Opinion testimony

Relevant to Sweet's case, the court heard opinion testimony from defense biomechanics expert Dr. Amy Courtney (summarized above) as well as Sweet's treating physician Dr. Paul Fenn and defense IME physicians Drs. Robby LeBlanc and Justin Penton.

#### a.  Paul Fenn

Dr. Fenn, an orthopedic surgeon, was accepted by the court as an expert in that field. Tr., Day 2, pp. 298–300. At trial he summarized his treatment of Lawryn Sweet, as described above. He testified that he commonly saw wrist injuries like Sweet's after motor vehicle accidents, particularly with loading on the wrist and jamming it as might happen if

a person were gripping the seat at impact. *Id.* at 340–41. He also testified that the discoid meniscus on her knee was a congenital condition, but that it appeared to become symptomatic after the accident based on the swelling and Baker's cyst also seen on the MRI. *Id.* at 342. He recommended surgery based on the fact that her symptoms had not resolved with physical therapy. *Id.* at 343–44. He agreed with the costs outlined in the life care plan and stated that he would perform the two wrist procedures simultaneously and then proceed with the knee after the wrist had healed. *Id.* at 345–50. He admitted, however, that Sweet had not yet scheduled any procedures with him. *Id.* at 366.

### b. Robby LeBlanc

Robby LeBlanc, an orthopedic hand surgeon, was accepted by the court as an expert in that field. Tr., Day 3, pp. 490–92. He testified that he performed an IME on Lawryn Sweet in June 2021 and opined based on that exam and records review that her wrist injury did not arise from the December 2017 accident. *Id.* at 503–04. He noted that Sweet reported pain at palpation and stress during the exam, but not at the points of the wrist correlated with the areas of injury concern based on her imaging. *Id.* at 506–07. He also noted that Sweet's difference in grip strength between her left and right side appeared to be exaggerated, and that the only abnormal findings he could discern were some laxity in her ligaments in both wrists. *Id.* at 508–10. Based on this fact, and the fact that Sweet's mother displayed the same laxity during her IME, Dr. LeBlanc opined that any popping she was experiencing was caused by this laxity as a congenital condition rather than as a result of the accident. *Id.* at 511. He further stated that neither of the wrist procedures recommended by Dr. Fenn would address the laxity issue. *Id.* at 512–13.

### c.  Justin Penton

Dr. Penton, an orthopedic surgeon, was accepted by the court as an expert in that field. Tr., Day 3, pp. 578–81. He testified that he performed an IME on Lawryn Sweet in July 2021 and, based on that examination, concluded that her knee symptoms were a result of her preexisting condition rather than the December 2017 accident. *Id.* at 581, 594–96. He stated that Sweet's only abnormal findings on exam were consistent with the chondromalacia diagnosed in 2012 rather than a meniscus tear or other result of trauma. *Id.* at 596–97. He further testified that, given the lack of meniscus injury, the operation recommended by Dr. Fenn was inappropriate and that Sweet still had additional conservative treatment options (namely, rest, ice, and over-the-counter anti-inflammatories) to exhaust before he would recommend any surgical solution to her knee pain. *Id.* at 599–601.

### E.  Damages

"The FTCA authorizes civil actions for damages against the United States . . . under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). Accordingly, Louisiana substantive law applies here. The court uses this law to analyze each plaintiff's claim for past and future medical expenses as well as general damages to compensate for pain and suffering and loss of enjoyment of life. *See* doc. 1, p. 5; doc. 51.

In a tort case, the plaintiff generally has the burden of proving each element of her claim—including causation of damages—by a preponderance of the evidence. *Lasha v.*

*Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993). A plaintiff may recover for past and future medical expenses caused by the defendant's tortious conduct. *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010). The plaintiff must establish, however, that she "incurred past medical expenses in good faith as a result of [her] injury and future medical expenses will more probably than not be incurred." *Id.* The factfinder is given great deference in its assessment of quantum for both general and special damages. *Guillory v. Lee*, 116 So.3d 1104, 1116 (La. 2009). Where the finding is based on determinations relating to the credibility of witnesses, the award can only be overturned on a showing of manifest error. *Jones v. Bravata*, 980 So.3d 226, 233 (La. Ct. App. 1st Cir. 2019) (citing *Adams v. Rhodia, Inc.*, 983 So.2d 798, 806 (La. 2008)).

### 1. Stacey O'Key

Plaintiffs have submitted medical bills totaling $89,830.25 for O'Key. Doc. 52, att. 58. They also claim future medicals of $1,090,257.00 and general damages of $500,000, though they admit that damages as to this plaintiff are capped at $800,000 due to her designation of that amount on her administrative claim. The government maintains that O'Key is not entitled to future medicals, due to her failure to prove that she will have the surgery recommended by Dr. Brennan or that it is medically necessary or that the injury in question was caused by the accident. It suggests an award of general damages in the range of $25,000 to $30,000. As the government notes, O'Key is not claiming any future care relating to her wrist or lumbar spine.

Regarding all of O'Key's past care, the court finds it reasonably related to symptoms caused or exacerbated by the accident and incurred in good faith. Accordingly, an award

of her full past medical expenses is justified. Regarding O'Key's neck injury, the court finds her pain complaints and the testimony of her treating physician on the advisability of surgery credible. The court also credits the testimony of her treating physician, and the admission of the IME doctor and Dr. Courtney that a single strain could act on existing degeneration to cause a herniation. Finally, the court accepts that O'Key will have surgery in the future and require the other treatments recommended, and that it was reasonable for her to delay surgery up until this point given the significance of the procedure and the disruption it will cause in her work and life. O'Key has complained consistently of pain, diligently sought relief through more conservative measures, and worked for years in an occupation that exacerbates her injuries. Accordingly, the court finds an award of **$985,985.00** (the midpoint of future medical costs at present value) in future medical expenses and an award of **$200,000.00** for past and future pain, suffering, and loss of enjoyment of life justified.

### 2.  Don Lewis

As for Don Lewis, the medical bills submitted by plaintiffs up to the date of trial total $68,194.99. Doc. 52, att. 60. Plaintiffs also claim future medicals in the amount of $590,032 and general damages in the amount of $350,000. The government suggests that a general damages award of $13,000 to $15,000 is more appropriate, asserting that Lewis has failed to appropriately connect his injuries to the accident or prove the necessity of future treatment and the likelihood that he will pursue it.

The court is persuaded that Lewis's lumbar injury was caused by the accident and that it will require future care, based on his continued complaints of pain and the credible

testimony of his family members regarding his back issues since the accident. As with O'Key, the court also finds reason to doubt Dr. Courtney's testimony on the impossibility of the accident causing such an injury. Given his success with the RFAs, the court further finds that future care costs related to the lower back are justified. The court credits, however, the testimony of the IME physicians on the likelihood that any shoulder injury was not caused by the accident and is not surgical. In this regard the court notes the gaps in Lewis's treatment for his shoulder, his history of playing sports that might have also caused the injury as well as his intervening accident with complaint of shoulder pain, and his continued work in manual labor that surely would have exacerbated an untreated injury. Accordingly, the court finds the limited past medical costs related to the shoulder were incurred in good faith and might have been related to exacerbation of symptoms caused by the accident but that no future medical costs are justified. Lewis will be awarded **$68,194.99** in past medical costs, **$415,294.00** in future medical costs, and past and future pain in suffering in the amount of **$125,000.00.**

### 3.  Lawryn Sweet

As for Sweet, the medical bills submitted up to the time of trial total $21,258.33. Doc. 52, att. 59. Plaintiffs also claim future medicals in the amount of $153,190.00 and general damages in the amount of $250,000.00. The government maintains that neither of Sweet's injuries can be linked to the accident, and that she should be limited to a general damages award of $10,000.00 to $13,000.00.

Based on the testimony regarding the accident, Sweet's lack of prior complaints regarding her wrist, and her consistent complaints and exhaustion of physical therapy after

the accident, the court finds it sufficiently likely that she sustained wrist trauma that caused lingering symptoms for some time after the accident. The court also finds it sufficiently likely that she sustained knee trauma, including a possible exacerbation of her preexisting cartilage condition, and that her past medical bills were incurred in good faith. Accordingly, an award of **$21,258.33** in past medical costs is justified as well as an award of **$50,000.00** in past pain, suffering, and loss of enjoyment of life. As for Sweet's current complaints, however, the court is concerned by the results of her IMEs and notes that she has primarily treated – even when not pregnant or breastfeeding – with over-the-counter medication. Furthermore, the court found no credible link between her carpal tunnel-like complaints and the 2017 trauma she sustained to her wrist. Accordingly, the court does not find it sufficiently likely that she will pursue surgery for either her wrist or knee or that such care would be linked to injuries sustained in the accident. Because the future medical costs all relate to future surgeries, no award for future care will be made.

### III.
### CONCLUSION

For the reasons stated above, judgment will be entered for the plaintiffs in the following amounts:

- Stacey O'Key:

    o **$89,830.25** in past medical costs

    o **$985,985.00** in future medical costs

    o **$200,000** in past and future pain, suffering, and loss of enjoyment of life

- o But with all damages reduced to **$800,000** by plaintiff's declaration on her administrative claim.

- Don Lewis:

    - o  **$68,194.99** in past medical costs

    - o **$415,294.00**

    - o **$125,000** in past and future pain, suffering, and loss of enjoyment of life

- Lawryn Sweet:

    - o **$21,258.33** in past medical costs

    - o **$0** in future medical costs

    - o **$50,000** in past pain, suffering, and loss of enjoyment of life

**THUS DONE AND SIGNED** in Chambers this 2nd day of June, 2022.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**